STUART, Justice.
In case no. 1111525, M & F Bank (“M & F”) appeals the summary judgment entered by the Jefferson Circuit Court in favor of First American Title Insurance Company (“FATIC”) on negligence, breach-of-contract, and bad-faith-failure-to-pay claims M & F asserted against FATIC related to a title-insurance policy (“the title policy”) FATIC issued M & F in connection with a mortgage loan made by M & F to a developer of property in Auburn. In case no. 1111568, FATIC appeals the summary judgment entered in favor of M & F on FATIC’s counterclaims asserting abuse of process, conspiracy, *224 breach of contract, and negligence. We affirm both judgments.
I.
This action was initiated in the Jefferson Circuit Court on October 29, 2008; however, related proceedings were subsequently conducted in the Lee Circuit Court and the United States Bankruptcy Court for the Northern District of Alabama. The parties have previously sought relief in this Court on multiple occasions as well. In Ex parte M & F Bank, 58 So.3d 111 (Ala. 2010), we denied a petition for the writ of mandamus filed by M & F seeking the reversal of a discovery order and summarized the genesis of the dispute and the procedural history up to that time:
“On December 19, 2006, a plat for a subdivision referred to as Old Towne Station was recorded in the office of the Judge of Probate of Lee County. The plat showed lots numbered 1 through 94; it did not show a lot 95.[1] On December 28, 2006, The Shoppes • at Old Towne Station, LLC (‘the debtor’), executed a note in favor of M & F evidencing an indebtedness of $2,855,000; the note purportedly was secured by a mortgage on ‘lot 95’ of Old Towne Station. On January 24, 2007, First American, through its agent, Blue Title, LLC, issued a title-insurance policy (‘the policy’) to M & F insuring M & F’s purported interest as mortgagee in lot 95.
“The debtor subsequently defaulted on the loan. As a result of the ‘title work’ performed in preparation for a foreclosure on the mortgage, M & F discovered that lot 95 was not included on the recorded plat. On October 29, 2008, M & F notified First American that it was making a claim under its title-insurance policy. On November 19, 2008, M & F — represented by attorney Burt Newsome — filed an action against Blue Title and First American in the Jefferson Circuit Court, alleging breach of contract.[2] On April 27, 2009, M & F amended its complaint to include claims of negligence and bad faith against First American.
“After being served with process in the action filed by M & F, First American hired attorney Mark Davis to file an action in the name of M & F seeking a reformation of the mortgage held by M & F and insured by First American; Davis filed the action in the Lee Circuit Court on March 20, 2009, naming as defendants the debtor and certain purported lienholders. First American purported to take this action in accordance with what it contends were stipulations in the policy it had issued to M & F.
“On March 13, 2009, the debtor filed a petition in the United States Bankruptcy Court for the Northern District of Alabama (‘the bankruptcy court’) declaring bankruptcy under Chapter 7 of the United States Bankruptcy Code. The debtor hired attorney Steven Altman to represent it in the bankruptcy proceedings. The bankruptcy court appointed André Toffel, an attorney, as bankruptcy trustee. In turn, Toffel hired attorney Stephen Porterfield to represent the trustee’s interests in the bankruptcy proceedings. First American subsequently hired attorney Rick Johanson to initiate an adversary proceeding in the bankruptcy court in the name of M & F against the debtor, the trustee, and other parties seeking reformation of the mortgage deed; Johanson filed a complaint in the bankruptcy court for this purpose on July 8, 2009. On July 27, 2009, Porterfield filed on behalf of Tof-fel, as trustee, an application with the bankruptcy court to sell the property that is the subject of the M & F mortgage free and clear of all liens. In *225 effect, Toffel sought to render the mortgage to M & F of no effect.
“Toffel subsequently filed an answer in the adversary proceeding initiated by Johanson on behalf of M & F; Toffel asserted affirmative defenses, including that he was what is known as an ‘ideal bona fide purchaser’ under 11 U.S.C. § 544(a) and in that capacity would be able to take the property at issue free of any mortgage interest held by M & F.
“In addition, Toffel and Johanson filed competing motions for a summary judgment in the adversary proceeding in which they debated whether Toffel was an ‘ideal bona fide purchaser’ under 11 U.S.C. § 544(a) and as such would be able to take the property free of M & F’s mortgage.
“First American asserts in its answer to this Court:
“ ‘In an extraordinary twist of events, M & F’s counsel, Mr. Newsome, actually had communications with Toffel and Porterfield regarding research he had done for them and critiquing the brief Porterfield was preparing in support of their motion for summary judgment against [M & F,] Mr. New-some’s client.... Mr. Newsome was actually doing research and assisting his client’s adversary who was attempting to have [M & F] determined to be an unsecured creditor.’
“First American also asserts that, in the course of preparing submissions for the bankruptcy court on behalf of M & F, Newsome had conversations with the debtor’s attorney, Altman, concerning Toffel’s filings with the bankruptcy court.
“M & F contends that Newsome engaged in the aforesaid communications because a resolution of M & F’s action against First American ‘would have to involve both the debtor’s attorney and the Chapter 7 Trustee.’ M & F claims that Newsome ‘had negotiations looking to compromise the outstanding controversies with the debtor’s attorney [Altman], the Chapter 7 Trustee [Toffel,] and the attorney for the Chapter 7 Trustee [Porterfield].’ M & F also insists that it ‘shares common interests’ with Altman, Toffel, and Porterfield because it asserts in the Jefferson Circuit Court action that the M & F mortgage on the property is void, and the debtor and Toffel contended in the bankruptcy court that the mortgage is void.
“On December 10, 2009, the bankruptcy court entered a summary judgment in favor of M & F and against Toffel with respect to the affirmative defenses asserted by Toffel in the adversary proceeding, including the defense that Tof-fel was an ‘ideal bona fide purchaser’ under 11 U.S.C. § 544(a). In so doing, the bankruptcy court declined to conclude that the M & F mortgage was invalid.
58 So.3d at 113-15 (footnotes 3 and 4 omitted). Following our decision in Ex parte M & F, the trial court continued to preside over repeated discovery disputes and a continually increasing level of rancor between the attorneys. Twice more, we denied petitions for the writ of mandamus filed by M & F, as well as a petition for permission to file an interlocutory appeal pursuant to Rule 5, Ala. R.App. P.
On February 28, 2011, the trial court granted FATIC’s motion to file newly ac *226 quired counterclaims pursuant to Rule 13(e), Ala. R. Civ. P. Those counterclaims included separate claims of abuse of process in both the instant action and the bankruptcy proceedings, claims alleging conspiracy, breach of contract, and negligence, and a request for attorney fees and expenses under the Alabama Litigation Accountability Act (“ALAA”), § 12-19-270 et seq., Ala.Code 1975. These claims are largely based on FATIC’s argument that M & F improperly acted in concert with the debtor in an attempt to have the mortgage secured by lot 95 declared void so that FATIC would be required to pay out money damages under the title-insurance policy instead of merely curing the defect that existed in the mortgage.[1] M & F thereafter filed an answer and moved to dismiss some of FATIC’s counterclaims. On May 18, 2011, the trial court granted that motion with respect to FATIC’s claim alleging abuse of process in the bankruptcy proceedings and also stated that it would consider the ALAA claim as a request for attorney fees and expenses to be heard at the conclusion of the case.
On June 30, 2011, the trial court held a hearing on motions filed by both M & F and FATIC seeking a summary judgment on the claims asserted by M & F. On August 25, 2011, the trial court denied M & F’s summary-judgment motion and granted FATIC’s summary-judgment motion, holding that the terms of the title-insurance policy issued to M & F by FAT-IC (1) limited M & F’s recovery to only breach of contract and excluded negligence claims and (2) authorized FATIC to cure any defects in the mortgage before paying damages under the policy. The trial court further held that FATIC had in fact cured any defects by recording additional documents with the Lee County Probate Office. Accordingly, the trial court entered a summary judgment in favor of FATIC on M & F’s negligence, breach-of-contract, and bad-faith claims. The trial court also denied M & F’s ensuing motions to reconsider and to certify the partial summary judgment as final pursuant to Rule 54(b), Ala. R. Civ. P.
On July 5, 2012, M & F moved the trial court to enter a summary judgment in its favor on the remaining counterclaims that had been asserted by FATIC. On July 27, 2012, the trial court granted M & F’s motion and dismissed FATIC’s counterclaims, thus disposing of all outstanding claims in the action. In its order entering a judgment in favor of M & F, the trial court also set forth the schedule for the parties to submit evidence and arguments regarding FATIC’s request for attorney fees and expenses pursuant to the ALAA. M & F subsequently moved the trial court for its own award of attorney fees and expenses pursuant to the ALAA as well.
On August 14, 2012, M & F filed its notice of appeal, challenging the trial court’s August 25, 2011, order entering a summary judgment in favor of FATIC on M & F’s negligence, breach-of-contract, and bad-faith claims (appeal docketed as case no. 1111525). See Gonzalez, LLC v. DiVincenti, 844 So.2d 1196, 1201 (Ala. 2002) (holding that a summary judgment was final and appealable even though a request for attorney fees and expenses pursuant to the ALAA remained pending because any award of attorney fees is collateral to the judgment). On September 7, 2012, FATIC filed its cross-appeal, chal *227 lenging the trial court’s dismissal of its abuse-of-process, conspiracy, breach-of-contract, and negligence claims (appeal docketed as case no. 1111568). These appeals have been consolidated for the purpose of writing one opinion.
II.
M & F and FATIC both argue that the trial court erred in entering a summary judgment adverse to them on the claims they had asserted against the other. We review this argument pursuant to the following standard:
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2008). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Ho-durski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035,1038-39 (Ala.2004).
III.
In its order entering a summary judgment in favor of FATIC on M & F’s claims, the trial court recognized that defining the terms of the contract between the parties was a “threshold issue.” Specifically, although the parties agreed that FATIC had issued a title-insurance policy to M & F insuring M & F’s interest as mortgagee in lot 95, they disagreed as to what documents made up the entirety of that policy. M & F argues that the policy consists only of documents marked schedules A & B, plus an additional set of 11 endorsements. M & F claims that these are the only documents it ever received from FATIC and argues that these are also the documents produced by FATIC’s issuing agent, Blue Title, in response to a discovery request for the policy that had been sent to M & F following its completion.
FATIC, however, argues that the complete policy consists not only of the documents cited by M & F, but also a jacket that contains additional exclusions from coverage, conditions, and stipulations.[2] In support of this argument, FATIC submit *228 ted to the trial court, pursuant to Rule 1004(3), Ala. R. Evid., a copy of what it alleged was the complete policy.[3] As further evidence that the complete policy includes the jacket, FATIC argues (1) that a copy of what it asserts was the complete policy was found in the files of the attorneys who represented M & F in its transaction with The Shoppes at Old Towne Station and (2) that an M & F officer previously submitted a copy of the front of the jacket as an exhibit to an affidavit he filed in which he claimed that that front of the jacket was part of the policy, thus indicating, FATIC argues, that the entire jacket and policy was in M & F’s possession. M & F counters by arguing that these were merely mid-negotiation documents exchanged between the parties, that the jacket was not attached to the final policy sent to M & F, and that any assertions M & F had made to the contrary were mistakes.
The trial court resolved this issue as follows:
“While there is a dispute between the parties on this point, the court finds that it is not a dispute of fact that may preclude consideration of the pending motions. First, it is undisputed that M & F’s counsel, in connection with the financing of the Old Towne Station purchase, received and had possession of the policy in its entirety. The court finds that because its counsel knew of the policy in its entirety, such knowledge must legally be imputed to M & F.
“M & F cannot be heard to argue that this would be an unjust result, moreover, given that it was on notice of the policy in its entirety. Attached to the affidavit of [M & F officer] Craig Nelson, filed on March 8, 2010, is what M & F claimed at that time to be the policy. That attachment contained the frontispiece of the jacket, which generally declares the terms of insurance coverage ‘subject to the exclusions from coverage, the exceptions from coverage contained in schedule B and the conditions and stipulations.... ’ Being on notice, M & F had the legal obligation to inquire into the nature of such additional provisions.”
We agree with this conclusion and further note that it is the front of the jacket, which M & F undisputedly received at some point, that contains the actual insuring provision that is alleged to have been breached. Thus, by asserting breach of contract, M & F is implicitly conceding that this insuring provision is part of the contract. Moreover, one of the endorsements M & F concedes is part of the policy provides that “[t]he policy is hereby amended by deleting paragraph no. 7 from the exclusions from coverage.” Paragraph no. 7, and all the other exclusions from coverage, as well as additional conditions and stipulations, are physically a part of the jacket, and this endorsement is accordingly further evidence that M & F understood those terms, with the stated exception of paragraph no. 7, to be a part of the policy. Finally, we note that all parties and attorneys involved in this dispute are sophisticated and experienced in these types of transactions and are surely familiar with the standard government-approved title-insurance policy forms. We accordingly agree with the trial court that there is no factual dispute but that the *229 exclusions from coverage and conditions and stipulations found on the jacket are part of the policy.
That being established, § 14(b) of the conditions and stipulations provides that “[a]ny claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.” FATIC argues that this provision limits M & F to a breach-of-contract claim and precludes it from pursuing a negligence claim. M & F, however, cites Soutullo v. Commonwealth Land Title Insurance Co., 646 So.2d 1352, 1355 (Ala.1994), in support of its argument that a negligence claim is viable. (“[The defendant title company] had a corresponding legal duty, upon which a negligence or wantonness action may be based, to exercise due care in performing its contractual obligations to examine the probate records....”) The trial court agreed with FATIC, distinguishing Soutullo as follows:
“In [Soutullo], the Supreme Court held that a title insurer could be held liable on a negligence claim for damages resulting from its failure to discover certain encumbrances. In reaching this holding, however, the Court noted the existence of a similar provision [to § 14(b) in this case] in that policy and then opined:
“ ‘This provision purports to release Commonwealth from all tort liability in connection with the issuance of its policies. Neither the record, nor the briefs, indicate that this provision could have formed the basis for the summary judgment. This specific provision was not cited by Commonwealth in its memorandum to the trial court in support of its motion for summary judgment or in its brief to this Court, and the trial court’s judgment does not refer to it. Therefore, we think that it would be improper for us to consider for the first time on appeal the legal effect that this provision might have with respect to Commonwealth’s potential liability.’
“[Soutullo, 646 So.2d] at 1356 n. 3. By contrast, FATIC here does rely on such language to argue against any negligence claim.
“This court agrees that the above language of the policy serves to bar M & F from asserting its negligence claim against FATIC. While M & F argues that such a ruling would contravene public policy of this State, this court disagrees. Decisions from the Alabama Supreme Court in the past few years make clear that a contract between parties may serve to trump what would otherwise be legal duties owing between them. An obvious example is a party’s ability to contract away liability otherwise sounding in tort for negligent conduct by having the other party sign a release to that effect.”
We likewise agree that § 14(b) precludes M & F’s negligence claim based on FAT-IC’s alleged breach of the duty of due care in preparing the policy.
M & F also argues, however, that it has asserted a separate negligence claim that is not subject to § 14(b) even if we hold that § 14(b) is part of the policy and should be enforced. Specifically, M & F argues that FATIC also was negligent in its provision of abstracting services, which, M & F argues, were provided under a separate contract, dated December 12, 2006, from the policy, which was effective January 24, 2007. However, the abstracted title search that forms the basis of M & F’s claim in this regard contains the following language:
*230 “This title search is furnished to the agent identified above (‘Agent’) by [FATIC] for the sole purpose of examining title to the real property described herein in order to determine the insura-bility thereof. The Agent is hereby authorized to rely upon this title search for the issuance of a [FATIC] policy or policies pursuant to the terms of the agency agreement between [FATIC] and the Agent.
“THIS TITLE SEARCH IS FURNISHED BY [FATIC] SOLELY FOR USE BY THE AGENT IN CONNECTION WITH THE ISSUANCE OF A POLICY OR POLICIES OF TITLE INSURANCE OF [FATIC]. ALL OTHER USES AND PURPOSES ARE EXPRESSLY PROHIBITED, AND LIABILITY HEREUNDER IS LIMITED TO LIABILITY ARISING UNDER SUCH [FATIC] POLICY ISSUED IN RELIANCE UPON THIS TITLE SEARCH.”
(Capitalization in original.) The agent referred to is elsewhere identified as Blue Title, and this language unambiguously indicates that this abstracted title search was performed solely for Blue Title’s benefit and was not to be relied upon by any other party for any other purpose. Moreover, it notes that any liability is “limited to liability arising under such [FATIC] policy issued in reliance upon this title search.” Accordingly, this negligence claim fares no better than the negligence claim explicitly based on the policy, and the trial court properly entered a summary judgment in favor of FATIC.
We next turn to M & F’s breach-of-contract claim. Section 8(a) of the conditions and stipulations in the policy provides as follows:
“If [FATIC] establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability on title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.”
In its order entering a partial summary judgment for FATIC, the trial court held that FATIC had established that the mortgage held by M & F was valid and that the property identified as lot 95 was therefore marketable. Thus, the trial court concluded, FATIC had fulfilled its responsibilities under the policy pursuant to § 8(a). The trial court explained its rationale as follows:
“The court here recognizes that while the mortgage at issue clearly has a problem in that it references lot 95, which does not appear on the recorded plat, that deficiency does not necessarily make title unmarketable under Alabama law. At issue in Messer-Johnson Realty Co. v. Security Savings & Loan Co., 208 Ala. 541, 94 So. 734 (1922), was whether a title was good and merchantable, notwithstanding defects in the record of title. The Supreme Court recognized:
“ ‘The rule that the title must be free from reasonable doubt does not require a title absolutely free from all suspicion or possible defect, but only requires a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and out to accept.’
*231 “208 Ala. at 548, 94 So. at 735. See also Barnett v. Waddell, 248 Ala. 189, 27 So.2d 1 (1946) (a legal description, to be effective, need only excite reasonable inquiry).
“This court concludes that FATIC, in exercising its rights under section 4 of the policy’s conditions and stipulations [authorizing FATIC to take action to secure insured’s interest in insured property], successfully established the validity of M & F’s mortgage in the bankruptcy court. (That it did not pursue reformation in that forum was only because of [M & F’s] instruction not to go forward.) Further, while there is no lot 95 on the recorded plat, the deed from Old Towne Station, LLC, to The Shoppes at Old Towne Station, LLC, contained certain identifying information about the land being conveyed that would excite reasonable inquiry. FAT-IC subsequently recorded in the Lee County Probate Court an affidavit from Chris Eckroate on March 19, 2009, which provided further information about the land referred to as lot 95. Finally, the bankruptcy court’s orders, and the pleadings filed therein, were also recorded.
“... The court further declares that FATIC has complied with its obligations under the title insurance policy in question and that it has no further duty or obligation to M & F Bank under the current circumstances.”
M & F argues that the trial court erred because, M & F argues, the mortgage is invalid, regardless of any action taken in the bankruptcy proceedings, because, M & F claims, the mortgage is in violation of § 11-52-33, Ala.Code 1975, and the Auburn Subdivision Regulations.[4] The only way the mortgage can be made valid and title to the property made marketable, M & F argues, is for the plat to be amended. Moreover, M & F argues that, even if the mortgage is valid, title to the property is still unmarketable.
With regard to the bankruptcy proceedings, we note that the trustee for The Shoppes at Old Towne Station moved the bankruptcy court to allow it to sell lot 95 free and clear of the mortgage- M & F purported to hold on it because, the trustee argued, that mortgage was invalid. The bankruptcy court rejected that motion, holding that the mortgage gave sufficient notice to any prospective purchaser of M & F’s claim to lot 95. As we stated in Ex parte M & F Bank, “[i]n so doing; the bankruptcy court declined to conclude that the M & F mortgage was invalid.” 58 So.3d at 115. M & F argues that declining to hold a mortgage invalid is not tantamount to holding it valid; however, we disagree in this instance. The bankruptcy court did not simply decline to rule on the validity of the mortgage; indeed, it could not have because the validity of the mortgage was the primary issue raised by the trustee in his motion seeking to sell lot 95. Transcripts of hearings conducted by the bankruptcy court in our record make this abundantly clear as well; the bankruptcy court definitively held that M & F’s mort *232 gage is valid. No appeal was taken from the bankruptcy court’s judgment, and that judgment, along with the applicable filings by M & F and the trustee, were subsequently recorded in the Lee County Probate Office for the purpose of establishing that mortgage. An affidavit from the project engineer identifying the location of lot 95 had previously been filed in the probate office also. Accordingly, we hold that M & F’s mortgage on lot 95 is valid.[5]
We also agree with the trial court’s conclusion that FATIC’s actions have “cure[d] the claim of unmarketability” of the title to lot 95, thus fulfilling its responsibilities under § 8(a) of the policy’s conditions and stipulations. On this issue, both parties cite Messer-Johnson Realty Co. v. Security Savings & Loan Co., 208 Ala. 541, 542-43, 94 So. 734, 735 (1922), in which we quoted the following excerpt from 39 Cyc. 1450(c):
“ ‘In equity a good title means a marketable title, and such a title is necessary and sufficient. And, according to the weight of authority, the same is now true at law, although it was formerly held, and seems to be still held in some jurisdictions, that at law a good title is any title not absolutely bad, and that a title which is not marketable may still be good.... Accepting the prevailing rule that a good title is a marketable title, a good or marketable title is a title which is free from reasonable doubt either in law or fact. In some jurisdictions it is held that it must be fairly deducible of record, while elsewhere it may in a clear case rest partly in parol unless the contract calls for a record title. It must consist of both the legal and equitable title. And it must not be in litigation, or be such as may subject the purchaser to the hazard and expense of future litigation. The rule that the title must be free from reasonable doubt does not require a title absolutely free from all suspicion or possible defect, but only requires a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept. The fact that in the action between the vendor and the purchaser the court may consider the title good does not render it marketable. In the absence of an express stipulation therefor, a marketable title does not mean a title which satisfies the purchaser, or which his attorney pronounces marketable.’ ”
FATIC argues that, with all the additional materials it has filed in the Lee County Probate Office, the title to lot 95 is free from reasonable doubt and that a reason *233 able purchaser ought to be willing to accept it. M & F, however, argues that any purchaser of lot 95 is subject to the hazard and expense of future litigation until such time as the plat containing lot 95 is properly amended; therefore, it argues, the title is not marketable. See also Boylan v. Wilson, 202 Ala. 26, 28, 79 So. 364, 366 (1918) (“A misdescription in a not too remote deed in the chain of title, not capable of being corrected without litigation and the aid of parol evidence, operates to render the title unmarketable.”). M & F has also submitted affidavits from attorneys experienced in property law supporting its argument that the title is unmarketable.
However, in light of the materials that have been filed in the probate office, the judgment of the trial court, our holding in Ex parte M & F Bank, and our holding today, we do not agree that the subject title is unmarketable. There is no dispute as to what parcel of real property lot 95 refers to, and an examination of the records in the probate office readily identifies that property. However, if any doubt remains, the judgment we enter today should effectively quell any concern of future litigation regarding the title to lot 95. Although frivolous actions are always a possibility, .this Court has spoken regarding the title, and our holding in that regard becomes the law; our judgment is not subject to being reversed.[6] For these reasons also, M & F cannot support its bad-faith-failure-to-pay claim. The judgment of the trial court entering a summary judgment in favor of FATIC on M & F’s claims is accordingly affirmed on all counts.
IV.
We next turn to FATIC’s argument that the trial court erred by entering a summary judgment in favor of M & F on its counterclaims. Two of those counterclaims alleged that M & F was liable for abuse of process based on its alleged attempt to wrongfully use the legal process to force FATIC to pay damages under the policy when FATIC had the right under the policy to first cure the defect in the mortgage with the legal description of lot 95; one counterclaim alleged abuse of process in the trial-court proceedings, and the other alleged abuse of process in the bankruptcy proceedings.
We have stated that “[t]he elements of the tort of abuse of process are 1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice.” C.C. & J., Inc. v. Hagood, 711 So.2d 947, 950 (Ala.1998) (citing Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221, 1225 (Ala. 1993)). The trial court held that FATIC failed to establish the first element of the existence of an ulterior purpose because, it held, there was no evidence indicating that M & F had any motive in bringing this action against FATIC other than as stated in its initial complaint — to recover on the policy. We agree. Ultimately the trial court held that FATIC was not required to make payment to M & F under the policy because it had in fact cured the defect in the mortgage; however, that was a legitimate issue, and the fact FATIC ultimately prevailed on this point is not evidence of an ulterior purpose on the part of M & F.
*234 The trial court properly entered a summary judgment on these counterclaims.[7] See also Duncan v. Kent, 370 So.2d 288, 290 (Ala.1979) (“The lawsuit was confined to its regular and legitimate function in relation to the cause of action stated in the complaint. The lawsuit was not brought for some ulterior or collateral purpose.”).
FATIC also asserted a counterclaim alleging that “M & F, its agents, servants, and employees, and Fictitious Parties A, B, C and D conspired, connived and contrived to defraud FATIC to pay the limits of the policy when FATIC had the right to cure any problem in the legal description of the mortgage.” The trial court entered a summary judgment in favor of M & F on this claim because FATIC never subsequently identified any fictitiously named parties and the intra-corporate-conspiracy doctrine holds that a corporation may not be held liable for any alleged conspiracy with its own employees or agents. See, e.g., Grider v. City of Auburn, 618 F.3d 1240, 1261 (11th Cir.2010) (“Specifically, ‘[t]he intracorpo-rate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy.’ McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir.2000).”). FATIC argues that a summary judgment should not have been entered on this counterclaim; however, it does not address the trial court’s invocation of the intracorporate-conspiracy doctrine in its appellate brief. That doctrine provides a sufficient ground for the summary judgment on this counterclaim, and the trial court did not err in this regard.
FATIC’s final two counterclaims are premised on § 4(d) of the conditions and stipulations in the policy, which provides:
“In all cases where this policy permits or required, [FATIC] to prosecute or to provide for the defense of any action or proceeding, [M & F] shall secure to [FATIC] the right to so prosecute or provide defense in the action or proceeding and all appeals therein, and permit [FATIC] to use, at its option, the name of [M & F] for this purpose. Whenever requested by [FATIC], [M & F], at [FATIC’s] expense, shall give [FATIC] all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting the settlement, and (ii) in any other lawful act which in the opinion of [FATIC] may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgaged, as insured. If [FATIC] is prejudiced by the failure of [M & F] to furnish the required cooperation, [FATIC’s] obligations to [M & F] under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation with regard to the matter or matters requiring such cooperation.”
FATIC argues that M & F breached this duty to cooperate and to act reasonably and is therefore liable for both negligence and breach of contract.
*235 With regard to its negligence counterclaim, FATIC argues that “[t]he trial court determined effectively that M & F owed and breached its duties to perform and act in a reasonable manner pursuant to § 4 of the conditions and stipulations of the subject policy.” FATIC’s brief, p. 87. However, in its order entering a summary judgment in favor of M & F on this negligence counterclaim, the trial court in fact stated that “[a]ny obligations that either party owed to the other stem solely from the provisions of the title insurance policy at issue, and this court declined to recognize private duties above and beyond the scope of any such contractual obligations.” FATIC does not argue or cite any authorities identifying or otherwise explaining the duties M & F allegedly breached, nor does it explain in any detail the alleged breach of those duties; instead, it merely makes a global assertion that a duty was owed and breached and cites general caselaw regarding the elements of a negligence claim. These conclusory statements and broad arguments are insufficient to establish that the trial court erred by entering a summary judgment in favor of M & F on the negligence counterclaim.
FATIC’s final argument is that the trial court erred by entering a summary judgment in favor of FATIC on its breach-of-contract counterclaim. In the trial court, M & F argued that, even if it did technically breach the contract by failing to cooperate as required by § 4(d), FATIC would be relieved of only its obligations under the policy; it would not, M & F argued, be entitled to damages for breach of contract. The trial court agreed, stating:
“M & F argues that [§ 4(d) ] defines only a condition precedent to any further obligation on FATIC’s part under the policy, citing Wood v. Allstate Ins. Co., 21 F.3d 741 (7th Cir.1994), in support of this interpretation. There, the [United States Court of Appeals for the] Seventh Circuit recognized general law to the effect that ‘breach of the cooperation clause by the insured will operate to relieve the insurer of liability under the policy.’ Id. at 745, quoting 8 Appleman, Insurance Law and Practice, § 4772 (1981).
“There are numerous decisions by Alabama’s appellate courts to the effect that an insured’s failure to cooperate absolves the insurer from its responsibilities under the policy. For example, in General Mut. Ins. Co. v. Dennis, 280 Ala. 434, 438, 194 So.2d 838, 841 (1967), the Supreme Court held that ‘[t]he cooperation clause, which the insurer has a perfect right to insist upon, and which will be enforced where the insurer shows that it has been breached, ... means that the insured must live up to his obligation under the contract and cooperate with the insurer, and ... it is inherent in the word “cooperation” as between the insured and the insurer that there be no collusion with the plaintiff.’ The Dennis case, however, was a suit brought by the insurer seeking only a declaratory judgment that it was under no further obligation to the insured. This court’s research turns up no case in which the insurer sued for damages based on an alleged breach of such a cooperation clause, and FATIC has cited no such law.
“The court therefore agrees with M & F that any obligations it bore under § 4 are a condition precedent to FATIC’s continuing obligations under the policy but that such obligations may not form the basis of a breach-of-contract claim.”
Like the trial court, we are aware of no case in which an insurer^ has sued for damages based on the insured’s alleged breach of a cooperation clause. In light of that fact and the fact that § 4(d) provides for a specific nonmonetary remedy for *236 such a breach — “[FATIC’s] obligations to [M & F] under the policy shall terminate” — we affirm the summary judgment entered by the trial court on FATIC’s breach-of-contract counterclaim.
V.
After M & F discovered a defect in the property description of a mortgage it had made, M & F sued FATIC, alleging negligence, breach of contract, and bad-faith failure to pay based on the title-insurance policy FATIC had issued M & F insuring M & F’s lien on the property covered by the mortgage. FATIC thereafter asserted counterclaims alleging abuse of process, conspiracy, breach of contract, and negligence. The trial court eventually entered a summary judgment in favor of FATIC on M & F’s claims and a summary judgment in favor of M & F on FATIC’s counterclaims. Those judgments are supported by the record and are accordingly affirmed.
1111525 — -AFFIRMED.
1111568 — AFFIRMED.
MOORE, C.J., and PARKER, SHAW, and WISE, JJ., concur.

"1 According to an affidavit from Chris Eckroate, the project engineer for the Old Towne Station subdivision development, and as conceded by M & F’s attorney in a hearing on the motion below, a lot apparently was labeled ‘Lot 95’ on the plat after it was recorded.

"2 Blue Title has since been dismissed from this action.”

. The bankruptcy-court judge summed up this case and the facts underlying these counterclaims as follows during a hearing: "The reason [M & F] [does not] like the fact that [it] won is pretty obvious to me. [It] [does not] want the property because, guess what, it is probably not worth what's owed on it and [M & F] would rather have the title insurance money."

. In a brief submitted to this Court in Ex parte M & F Bank, FATIC described the physical makeup of the jacket, which it referred to in that brief as the "FATIC 412 policy form,” and how a complete policy is assembled:
"It is a single piece of paper, measuring eight and one-half inches by twenty-two inches, folded in half with the exclusions, conditions and stipulations being printed on the inside of the folded form, into which the schedules are inserted. As can readily be seen, the exclusions, conditions and stipulations cannot be separated from the cover except by tearing or cutting the policy. The schedules, any endorsements, and the FAT-IC 412 policy form comprise the complete insurance contract.”
FATIC's brief in Ex parte M & F Bank, p. 7. See R & G, LLC v. RCH IV-WB, LLC, 122 So.3d 1253, 1258 (Ala.2013) (taking judicial notice of record in previous appellate proceedings between same parties to the extent it pertained to issues in the current appeal).

. Rule 1004(3) provides as follows:
“The original is not required, and other evidence of the contents of a writing is admissible, should there be no duplicate readily available to the proponent or witness, if ... [a]t a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing, and that party does not produce the original at the hearing....”

. Section 11-52-33 forbids the owner of any land in a subdivision from transferring or selling or agreeing to sell or negotiating to sell "any land by reference to or exhibition of or by other use of a plat of a subdivision before such plat has been approved by the planning commission and recorded or filed in the office of the appropriate county probate office_” M & F argues that § 11-52-33 invalidates the mortgage it holds on lot 95 because the final plat that was recorded does not contain lot 95.
Article 111(F)(3)(f) of the Auburn Subdivision Regulations provides that the final plat submitted to the probate office must contain "[n]umbers to identify each block and tract; and the area of each lot.”

. Although the bankruptcy court has already held M & F’s mortgage to be valid, we also note that we see no conflict with § 11-52-33 or Article 111(F)(3)(f) of the Auburn Subdivision Regulations. As explained in Kilgore Development, Inc. v. Woodland Place, LLC, 47 So.3d 267, 271 (Ala.Civ.App.2009), the subdivision-control statutes, § 11-52-30 et seq., Ala.Code 1975, "are aimed at preventing developers from selling tracts of land within a subdivision before the plat of that subdivision has been approved and recorded.” There is no dispute that the Old Towne Station plat had been approved and recorded and that that plat contains the property referred to as lot 95 in the mortgage, though it is not properly labeled as such on the plat. Moreover, Article 111(F)(3) of the Auburn Subdivision Regulations concerns the information that must be on a final plat before that plat is submitted to the planning commission for approval. Subsection (f) provides that numbers must identify "each block and lot” on the plat, and, although it would have apparently been justified in declining to approve the Old Towne Station plat based on the failure to comply with this requirement, the planning commission apparently elected not to do so.

. See In re Lee, 461 Fed.App'x 227, 232 (4th Cir.2012) (not selected for publication in the Federal Reporter) ("Notably, real property law is an area in which federal courts are especially deferential to state courts. See Dayton & M. R. Co. v. Comm'r, 112 F.2d 627, 630 (4th Cir.1940) (noting that even prior to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) it was 'well settled that we were bound by state decisions as to rights of property and other matters of local law'); Warburton v. White, 176 U.S. 484, 496, 20 S.Ct. 404, 44 L.Ed. 555 (1900).").

. M & F also argues that it would be inappropriate for this Court to consider FATIC's claim that M & F committed the tort of abuse of process in the bankruptcy action because the bankruptcy court is capable of policing matters within its own jurisdiction. See MSR Exploration, Ltd. v. Meridian Oil, Inc., 74 F.3d 910, 916 (9th Cir.1996) (stating that debtor’s malicious-prosecution claim against creditor "should have been brought in the bankruptcy court itself, and not as a separate action in the district court"). We have already determined, however, that, as a matter of law, FATIC was not entitled to relief on its abuse-of-process claims, so it is unnecessary for us to consider this additional ground in support of the trial court’s judgment.